**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION**

ARRON BERNARD CLARK,

        Movant,

    v.

UNITED STATES OF AMERICA,

        Respondent.

CIVIL ACTION NO.: 2:16-cv-143

(Case No.: 2:15-cr-08)

## ORDER and MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

On January 21, 2016, this Court sentenced Arron Bernard Clark ("Clark") to three hundred months' imprisonment after he pleaded guilty to the crimes of conspiracy to possess with intent to distribute and to distribute controlled substances and possession of a firearm in furtherance of a drug trafficking crime. Clark, who is currently incarcerated at the United States Penitentiary in Pine Knot, Kentucky, filed a Motion to Vacate, Set Aside, or Correct his Sentence pursuant to 28 U.S.C. § 2255. (Doc. 804.)[1] Clark contends that various errors by his trial counsel plagued his guilty plea and sentence. As laid out below, Clark's claims lack merit. Clark's conviction and sentence resulted from his own admitted criminal conduct, not any errors by his counsel. Thus, for the reasons set forth below, I **RECOMMEND** the Court **DENY** Clark's Motion to Vacate, Set Aside, or Correct his Sentence. Further, I **RECOMMEND** that the Court **DENY** Clark a Certificate of Appealability and *in forma pauperis* status on appeal.

---

[1] The pertinent record documents in this case are filed on the docket of Clark's criminal case, United States v. Clark, *et al.*, 2:15-cr-08 (S.D. Ga. April 8, 2015), and many are not included in Clark's civil docket. Thus, for ease of reference and consistency, the Court cites to Clark's criminal docket in this Order and Report and Recommendation.

The Court should **DIRECT** the Clerk of Court to **CLOSE** this case and enter the appropriate judgment of dismissal.

The Court **GRANTS** Clark's Application to Expand the Record, (doc. 805), and the Government's Motion for Extension of Time, (doc. 834). The Court has considered Clark's affidavit attached to his Application and the Government's subsequently filed Response when issuing this Report and Recommendation.[2]

## BACKGROUND

### I. Indictment and Clark's Guilty Plea

On April 8, 2015, the grand jury for this District returned a thirty-count Indictment against Clark and seventeen co-defendants. (Doc. 3.) The Indictment arose out of an alleged drug trafficking organization in Glynn County, Georgia. (Id.) The grand jury charged Clark, the lead defendant, with: conspiracy to possess with intent to distribute and to distribute cocaine base and cocaine hydrochloride in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846 and 18 U.S.C. § 2 (Count One); possessing a firearm as a convicted felon in violation of 18 U.S.C. § 922(g)(1) (Count Four); and possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A) (Count Five). (Id.) Count Five of the Indictment specifically listed the firearms Clark allegedly possessed in furtherance of the drug trafficking

---

[2] The Court **DENIES** Clark's request for an evidentiary hearing, (doc. 804-1, pp. 3–6.) Clark has the burden of establishing the need for an evidentiary hearing, see Birt v. Montgomery, 725 F.2d 587, 591 (11th Cir. 1984), and would be entitled to a hearing only if his allegations, if proved, would establish his right to collateral relief, see Townsend v. Sain, 372 U.S. 293, 307 (1963). Under Rule 4(b) of the Rules Governing Section 2255 Cases, a district court may summarily dismiss a Section 2255 motion "if it plainly appears from the face of the motion and any annexed exhibits and the prior proceedings in the case that the movant is not entitled to relief." Broadwater v. United States, 292 F.3d 1302, 1303 (11th Cir. 2002) (citation omitted). Accordingly, no hearing is required when the record establishes that a Section 2255 claim lacks merit. United States v. Lagrone, 727 F.2d 1037, 1038 (11th Cir. 1984). Additionally, the court need not hold a hearing where the record reveals that the claim is defaulted. McCleskey v. Zant, 499 U.S. 467, 494 (1991). Clark has not established any basis for an evidentiary hearing because the record reveals that all of the issues he raise either lack merit or are procedurally defaulted, waived, or barred.

crime charged in Count One.  (Id. at pp. 5–6.)  The Government asserted in its Penalty Certification that Clark faced not more than twenty years' imprisonment as to Count One; not more than ten years' imprisonment as to Count Four; and not less than five years' imprisonment as to Count Five.  (Doc. 4.)

Subsequently, Clark and his appointed attorney, Mr. Marvin Paul Hicks, III, were able to negotiate a plea agreement with the Government whereby Clark agreed to plead guilty to Counts One and Five of the Indictment.  (Doc. 565.)  Clark also agreed to waive his rights to appeal and collaterally attack his sentence with limited exceptions.  (Id. at p. 8.)  In exchange, the Government agreed to dismiss the remaining count of the Indictment against Clark.  Among other things, the plea agreement laid out the elements the Government must prove in order for Clark to be found guilty of Counts One and Five, Clark's offense conduct, and the factual basis for his guilty plea.  (Id. at pp. 4–5.)  Through the plea agreement, Clark agreed that he "has had the benefit of legal counsel in negotiating this agreement.  Defendant believes that his attorney has represented him faithfully, skillfully, and diligently, and he is completely satisfied with the legal advice given and the work performed by his attorney."  (Id. at p. 9.)

On August 27, 2015, Clark appeared before the Honorable Lisa Godbey Wood for a change of plea, or Rule 11, proceeding.  (Doc. 561.)  At the hearing, Judge Wood engaged in an extensive plea colloquy with Clark.  She explained to Clark that the decision to plead guilty was an important one, that the decision was entirely his decision, and that she wanted to be certain Clark understood all of the important issues to be considered before making a decision.  (Doc. 572, pp. 2–3.)  Judge Wood inquired whether anyone was making, pushing, or leaning on Clark to plead guilty, and he said no one had done so and that pleading guilty was what he wanted to do.  (Id. at p. 3.)

Judge Wood had Clark placed under oath before asking him a series of questions. (Id.) He then related his personal information, including his age, the ages of his children, and his residence. (Id. at p. 4.) Clark recounted his educational and employment history—he completed the tenth grade and worked in landscaping. (Id. at pp. 4–5.) Clark stated that he had no physical or mental disability, took no medications, and had not had any drugs or alcohol since the date of his arrest months prior. (Id. at p. 5.)

Judge Wood explained to Clark that he was presumed innocent and the Indictment was not evidence of his guilt. (Id.) She also explained that he did not have to plead guilty and that he had the right to maintain a plea of not guilty. (Id. at p. 6.) Judge Wood further advised Clark that if he chose to persist in his not guilty plea, he would have the right to a public and speedy trial by jury, a presumption of innocence during that trial, and the assistance of counsel through every phase of the case. (Id. at pp. 6–7.) Judge Wood told Clark that if he went to trial he could see, hear, confront, and cross-examine the Government's witnesses and evidence, call witnesses on his behalf, and testify himself or remain silent. (Id. at p. 7.) Judge Wood cautioned Clark he would be waiving those rights if he pleaded guilty. (Id. at pp. 7–8.) She explained that, if she accepted his guilty plea, there would be no right to trial of any kind and all that would remain of his case would be the sentencing phase. (Id.) Clark stated that he understood and that he had no questions regarding the waiver of his rights. (Id. at p. 8.)

Judge Wood asked Clark if he and Mr. Hicks had the opportunity to discuss the facts and law as they pertain to his case. (Id. at p. 8.) Clark responded, "Most of them, yes ma'am." (Id.) Judge Wood followed up on this answer, and Clark stated, "I ain't really seen really no discovery, no phone taps." (Id.) Judge Wood asked Clark if there were things that he wanted to examine before he changed his plea but Clark declined. (Id. at pp. 8–10.) Upon inquiry from the

Court, Mr. Hicks stated that Clark wanted to change his plea due to developments in the prosecution of the conspiracy, and Clark agreed with that assessment. (Id. at pp. 8–9.) Judge Wood then explored whether Clark had sufficiently discussed the law and facts of his case with Mr. Hicks. (Id. at p. 9.) She asked, "Do you need to talk with [Mr. Hicks] more about the facts and the law as they pertain to your case?" (Id.) Clark responded, "No, ma'am." (Id.) Judge Wood then added, "Do you feel like you've done that a sufficient amount?" (Id.) Clark responded, "Yes, ma'am." (Id.) Mr. Hicks also confirmed that he and Clark had an adequate discussion of the facts and law of the case. (Id. at p. 10.)

When Judge Wood asked Clark whether he had discussed the Indictment with Mr. Hicks, Clark repeated that he had not seen the "phone taps and other stuff." (Id.) Judge Wood again asked, "Is that something that you still want to look at before you plead guilty?" Clark responded that he did not. (Id.) Judge Wood followed up with another question as to whether Clark wanted to look at any discovery more closely before he entered his plea, and Clark yet again responded, "No, ma'am." (Id.)

Clark then testified, upon inquiry from Judge Wood, that he had an opportunity to review and discuss the Indictment with Mr. Hicks. (Id. at p. 11.) He also affirmed that he and Mr. Hicks had reviewed and discussed the plea agreement, the United States Sentencing Guidelines ("Sentencing Guidelines" or "Guidelines"), and what would occur at the Rule 11 hearing. (Id.) Clark further testified that he was satisfied with Mr. Hicks' representation and that he had no complaints about Mr. Hicks whatsoever. (Id. at pp. 11–12.)

Judge Wood then reviewed in detail the three counts of the Indictment against Clark and asked him if he understood the allegations. (Id. at pp. 12–14.) Clark responded that he understood. (Id. at p. 14.) Judge Wood then explained to Clark "the essential elements" that the

Government would have to prove in order to convict Clark of Counts One and Five, the Counts to which he was pleading guilty. (Id. at pp. 14–15.) As to Count Five, Judge Wood explained:

> [T]here are two essential elements that the Government would have to prove beyond a reasonable doubt in order for you to be convicted of possession of firearm in furtherance of a drug trafficking crime. Those elements are first that you committed the drug trafficking crime charged in Count 1 of the indictment, and, second, that you knowingly possessed a firearm in furtherance of that crime as charged in the indictment.

(Id. at p. 15.) Clark testified that he understood and that by pleading guilty he would admit those elements were satisfied. (Id.)

Judge Wood advised Clark of the penalties she could impose on the Counts to which he was pleading guilty. (Id. at pp. 13–14.) She specifically explained that Count Five carried a mandatory minimum of five years' imprisonment consecutive to any sentence on Count One. (Id. at p. 16.) Clark responded that he understood. (Id.) Moreover, Judge Wood explained to Clark that, in imposing a sentence upon him, she would have to take into consideration the advisory Sentencing Guidelines and the factors set forth in 18 U.S.C. § 3553. She then outlined the factors she would consider at sentencing. (Id. at p. 16–17.) Judge Wood asked Clark if he had any questions about sentencing, and he responded that he did not. (Id. at p. 17.) Upon questioning, Clark testified that no one had "promised [him] an exact sentence," to which Judge Wood replied, "That's good because at this point, all they could do is just give you their best guess or their best estimate, and that would never be binding upon me." (Id. at 16–17.)

Clark confirmed that he had given Mr. Hicks permission to negotiate a plea agreement with the Government. (Id.) Judge Wood then asked the Assistant United States Attorney ("AUSA") to summarize the provisions of the plea agreement. AUSA Charlie Bourne stated:

> The Government agrees not to object to a recommendation from probation that the Defendant receive a three-level reduction for acceptance of responsibility based on the timeliness of his plea, the earliness and provided he truthfully admits

the conduct comprising the offenses of conviction and that he doesn't commit any further criminal conduct.

The Government also agrees not to file an 851 enhancement if applicable as to this Defendant. The Government also agrees to dismiss Count 4.

The Defendant agrees to plead guilty to Counts 1 and 5, acknowledge at the time of the plea the truth of the factual basis contained in the plea agreement, pay on the date of sentencing any assessments imposed by The Court. He waives his right to appeal with three exceptions and he entirely waives his right to collaterally attack his conviction and sentence with one exception, Your Honor, and that's the extent of the plea agreement.

(Id. at pp. 18–19.) Judge Wood asked Clark if AUSA Bourne's summarization of the plea agreement was consistent with the plea agreement he signed, and Clark stated it was. (Id. at p. 19.) Clark also stated he read the plea agreement and discussed it with Mr. Hicks before he signed it. (Id.) Clark affirmed that no one had made him any promises regarding the outcome of his case other than the provisions contained in the plea agreement. (Id.)

Judge Wood then specifically addressed the direct appeal waiver with Clark, stating the following:

I want to pick back up on something that Mr. Bourne mentioned, and that is contained in that agreement that you're presenting is a waiver of certain appellate rights.

It states "Defendant entirely waives his right to a direct appeal of his conviction and sentence on any ground." Now there are three exceptions to that waiver, that is, you get a direct appeal right if one of those three things were to occur: Number 1, if I sentence you above the statutory maximum, then you can appeal that directly; Number 2, if I were to sentence you above the advisory guideline range as found by me, then you could appeal that directly; or Number 3, if the Government were to file a direct appeal, then you too can file a direct appeal.

Otherwise, by virtue of that plea agreement you waive all other direct appellate rights; understand?

(Id. at p. 19–20.) Clark stated he understood the appeal waiver provision and that he had no questions about it. (Id. at p. 20.)

Judge Wood also explained that the proposed plea agreement contained a waiver of certain of Clark's collateral attack rights:

> Also contained in the agreement that you're proposing is a waiver of certain collateral attack rights. It states "Defendant entirely waives his right to collaterally attack his conviction and sentence on any ground and by any method including but not limited to a 28 USC Section 2255 motion."
>
> The only exception to that waiver of collateral attack rights is that you do retain the right to collaterally attack based on a claim of ineffective assistance of counsel; understand?

(Id.) Clark replied that he understood the collateral attack waiver provision and that he did not have any questions about the waiver. (Id. at pp. 20–21.)

Judge Wood asked Mr. Hicks and AUSA Bourne whether they were aware of any impropriety on the part of the Government in handling Clark's case, and they both responded in the negative. (Id. at p. 21.) Judge Wood then asked Clark whether he still wished to plead guilty to Counts One and Five of the Indictment because he was in fact guilty of those Counts, and Clark answered in the affirmative. (Id. at p. 21.) Judge Wood also asked Clark whether he understood the rights and privileges he was waiving if she accepted his plea, and he said he did. (Id.) Judge Wood then summarized:

> I've watched [Mr. Clark] this morning as he's participated in the hearing and listened carefully to the responses that he's given to my question[s].
>
> I find in particular that Mr. Clark is participating in this hearing knowingly and intelligently. He has an appreciation for the charges that are pending against him, the essential elements that make up each charge. He understands the consequences of his plea and the rights that he waives. He understands the maximum possible penalty and the fact that there is a mandatory minimum sentence involved as to Count 5. He[] has the services of a competent defense attorney who has gone over the indictment, the plea agreement, the sentencing guidelines. They have discussed the facts and the law on multiple occasions.
>
> With regard to Mr. Clark in particular, I did find it necessary to explore his bringing up the fact about transcripts and so forth, and I find in particular that Mr.

> Clark and Mr. Hicks are both satisfied with the discussions that they've had and with Mr. Clark's interaction in his case.
>
> Mr. Clark in particular says that he does not want to take any more time looking at any other discovery before he enters his plea. I find no reason to doubt the truth of that statement.
>
> In summary I find that Mr. Clark has participated knowingly and intelligently in this hearing. I also find that his offer to plead guilty is voluntary; is that correct, Mr. Clark?

(Id. at pp. 22–23.) Clark responded in agreement with Judge Wood's conclusions. (Id. at p. 23.)

Steven Hall, a special agent with the Federal Bureau of Investigation ("FBI"), provided the Government's factual basis for the plea. (Id. at pp. 22–24.) Agent Hall testified that he was involved in a coordinated federal and state investigation of a drug organization operating in Brunswick, Georgia. (Id. at pp. 23–24.) He explained that Clark was one of two main targets of the investigation and that the investigation involved numerous techniques, including search warrants, informants, pole cameras, and wiretaps. (Id. at p. 24.) The investigation recorded thousands of Clark's phone calls, some of which were pertinent to drug trafficking, and revealed that Clark was part of an organization that distributed cocaine and crack cocaine on Wolfe Street in Brunswick. (Id. at pp. 24–25.) Hall testified that members of the organization routinely had firearms for the purpose of "protecting their assets." (Id. at p. 25.) A search of Clark's home revealed that he had several firearms—a 9mm Taurus pistol in the same room with Clark and two rifles and two additional pistols under Clark's house. (Id. at p. 25.) Hall stated that the search of Clark's home also uncovered cocaine, cash, and drug packaging materials. (Id.)

Judge Wood then asked Clark whether he disputed any of Agent Hall's testimony. (Id. at p. 26.) Clark responded, "Only the dope. But the rest I don't know nothing about. I know about the dope." (Id.) Judge Wood asked about the guns and Clark admitted that he "had one in possession." (Id.) Thus, based on the record established during this proceeding, Judge Wood

found that there was a factual basis for the plea of guilty, accepted Clark's plea, and adjudged him guilty of Counts One and Five of the Indictment. (Id. at pp. 26–27.) Judge Wood advised Clark that the United States Probation Office would prepare a Pre-Sentence Investigation Report ("PSI"), and the Court would schedule a sentencing hearing after the PSI was disclosed to the Government and the Defense. (Id.)

## II. Presentence Investigation Report and Objections

Prior to Clark's sentencing hearing, United States Probation Officer Scott Riggs prepared a PSI. Probation Officer Riggs detailed Clark's offense conduct and criminal history and calculated Clark's advisory sentencing range under the Sentencing Guidelines. (Doc. 707.) The PSI indicated that the Indictment in this case grew out of the FBI's investigation of the criminal activity from two rival street gangs operating in Brunswick, Georgia. (Id. at ¶¶ 4–26.) The investigation revealed that Clark was the co-leader of one of the gangs, which the Probation Officer labeled the "Clark Drug Trafficking Organization" or "Clark DTO." (Id. at ¶ 4.) The FBI's investigation of the Clark DTO included: undercover operations; visual surveillance; controlled purchases of drugs; confidential informants; surveillance and recording of incriminating telephone conversations and electronic communications through court-authorized wiretaps and pen registers; execution of search warrants; interviews with Clark and his co-conspirators; and interception of "jail calls" from the Glynn County Detention Center between Clark and his co-conspirators following their arrests. (Id. at ¶¶ 6–26.)

The PSI detailed that Clark led, and was extensively involved in, a very active drug distribution operation centered in the Wolfe Street area of Brunswick. (Id.) For instance, a six-week surveillance of one co-conspirator's cellular telephone revealed approximately 100 conversations related to drug distribution. (Id. at ¶ 8.) Clark's own cellular telephone was

monitored from November 6, 2014 to December 20, 2014. (Id. at ¶¶ 13–17.) Agents recorded conversations during which Clark negotiated the purchase of powder cocaine from various sources of supply, discussed personally cooking crack cocaine, directed the drug dealing activities of other members of the conspiracy, and coordinated sales of crack cocaine to numerous customers. (Id. at ¶¶ 13–17.) "For example, during the 2-day period of November 7 and November 8, 2014, Clark conducted a total of approximately 50 drug transactions involving the distribution of a total of at least $1,250 worth (12.5 grams) of crack cocaine." (Id. at ¶ 13.)

The surveilled communications also revealed that Clark used a home located at 1107 J Street to facilitate his drug trafficking.[3] (Id. at ¶ 15–17.) Clark shared this home with Ebone Alvin, a woman with whom he had a romantic relationship. (Id. ¶ 15.) According to the PSI, Clark sent customers to the residence on J Street and directed Alvin to conduct drug transactions with the customers. (Id. ¶ 15.) During the time of the wire intercept, Alvin conducted approximately thirty such transactions. (Id.) The intercepted communications also uncovered that Clark cooked crack cocaine inside the J Street residence, stored crack cocaine in the residence for future sales, and directed Alvin to hide glass beakers used for cooking crack cocaine under the residence. (Id. ¶¶ 15–17.)

Ultimately, the wiretap showed that Clark and other members of his DTO distributed at least 32.25 ounces of crack cocaine during the ten weeks of the wiretap investigation. (Id. at ¶ 26.) The Probation Officer stated that the total amount of distribution in this case was actually much higher than the amount distributed during the limited ten-week period. The investigation, including Clark's own statements, revealed that Clark and other members of the conspiracy distributed crack cocaine from at least January 1, 2014 through April 8, 2015. (Id.) Nonetheless,

---

[3] The home at 1107 J Street is located less than half a mile from the 2400 block of Wolfe Street where the majority of the drug trafficking activities of the Clark DTO allegedly took place.

for the purpose of calculating Clark's Guidelines range, the Probation Officer "conservatively attributed" a total of at least 32.25 ounces (or 914.28 grams of crack cocaine) to Clark.  (Id.)

In addition to an extensive history of drug transactions, the PSI also detailed the Clark DTO's involvement in acts of violence and possession of firearms.  The gang's activities included eleven shooting incidents during the weekend of February 1, 2014.  (Id. at ¶ 5.)  These incidents encompassed one shooting during which Clark and his fellow gang members fired multiple shots at a rival gang member from a vehicle in the parking lot of a large retail store. (Id.)  During a retaliatory shooting incident on March 22, 2014, Clark was shot in the right hand. (Id.)  Clark also repeatedly discussed firearms during intercepted communications.  For instance, on October 15, 2014, Clark and co-conspirator, Christopher Young, discussed that law enforcement presence on Wolfe Street was interfering with their drug activities and that law enforcement uncovered two firearms in an abandoned building on the street.  (Id. at ¶ 8.)  On another occasion, Clark directed Young to the location of two firearms concealed beneath a house and, weeks later, confirmed to Young that Clark had "concealed a firearm ('Uzi') to protect the firearm from the rain."  (Id. a ¶ 9.)  When conducting a search of the residence of Young's girlfriend, agents located a loaded handgun, ammunition, crack cocaine, tools of the drug trade, and cash.  (Id. at ¶ 11.)  On another occasion, Young called Clark and co-conspirator Johnny Lee Williams from the Glynn County Detention Center to discuss a firearm that Young had concealed beneath the sink of an abandoned residence on Wolfe Street and another firearm ("the Terminator") that law enforcement had not discovered when searching Young's residence. (Id. at ¶ 24.)

Ultimately, agents discovered "the Terminator" along with several other firearms, crack cocaine, tools of the drug trade, and cash during a search of Clark and Alvin's residence on J

Street. (Id. at ¶¶ 17–19.) On the morning of December 20, 2014, agents executed a search warrant at the home. (Id.) They discovered Clark, Alvin, and a minor child in the living room of the home. Clark and the minor child were lying on a mattress on the floor with a loaded Taurus 9mm pistol directly beside Clark. (Id. at ¶ 17.) In the ensuing search of the living room, officers located several pieces of crack cocaine in baggies. (Id. at ¶ 18.) The search of the master bedroom revealed more crack cocaine in baggies, hydrocodone pills, and gang related literature. (Id.) Agents also located several boxes of baking soda in the kitchen and $510 in cash stored throughout the house. (Id.) Concealed in the crawl space beneath the house, agents located a loaded .38 caliber revolver, a loaded 9mm semiautomatic pistol, a loaded 7.62x39mm semiautomatic rifle, an unloaded 7.62x39mm semiautomatic rifle with a black cutout stock (the aforementioned "Terminator"), a loaded 30-round 7.62x39mm ammunition magazine, and a loaded 30-round 9mm ammunition magazine. (Id. at ¶ 19.) "Agents recovered a mechanical press ('kilo press') in the yard on the side of the residence." (Id.)

Following the search and his ensuring arrest, Clark admitted to his drug distribution activities during an interview with law enforcement. (Id. at ¶ 21–22.) Clark stated that he had been residing at the J Street home for approximately two months and claimed ownership of all the drugs found during the search. (Id.) He "admitted that he had been selling crack cocaine for approximately 9 or 10 months as of the date of his arrest in December 2014 and that he sold crack cocaine on Wolfe Street in Brunswick on a daily basis ('24/7')." (Id. at ¶ 22.) Clark also claimed ownership of the Taurus 9mm pistol that agents found lying beside him on the mattress. (Id. at ¶ 21.) Clark stated that he procured the firearm in a trade with a drug customer for $60 worth of crack cocaine and that he obtained the firearm for personal protection. (Id.) However, Clark denied any knowledge of the firearms found under the residence. Id. Agents also

interviewed Alvin after the search, and she admitted that she and Clark lived at the home, that she sold crack cocaine to his customers out of the home, and that Clark packaged the drugs and left them on top of the refrigerator for her to sell. (Id. at ¶ 20.)

Pursuant to U.S.S.G. § 2D1.1, Probation Officer Riggs recommended a base offense level of 32 for Count One because Clark's offense involved at least 840 grams but less than 2.8 kilograms of cocaine. (Id. at ¶ 32.) The Probation Officer also recommended a four-level enhancement under U.S.S.G. § 3B1.1(a) for Clark's role in the offense, because Clark was an organizer or leader of a criminal activity that involved five or more participants. (Id. at ¶ 35.) Additionally, the Probation Officer recommended that the Court increase the offense level by two under U.S.S.G. § 3C1.1 for obstruction of justice. (Id. at ¶ 36.) The Probation Officer recommended this increase because Clark testified at the Rule 11 hearing that he had no knowledge of the firearms found beneath his house. (Id. at ¶ 28.) Similarly, the Probation Officer recommended that the Court not adjust Clark's offense level downward for acceptance of responsibility because, though Clark admitted to participating in the conspiracy to distribute drugs and to possessing the 9mm pistol found near his person, he denied any knowledge of the firearms found beneath the house. (Id. at ¶¶ 29, 39.) The PSI recommended a total offense level of 38 for Count One. (Id. at ¶ 40.) This offense level, combined with Clark's criminal history category of IV, resulted in a Guidelines sentencing range of 324 to 405 months' imprisonment. (Id. ¶ 73.) However, because the maximum statutory penalty of 240 months was lower than that range, the Guidelines term of imprisonment was 240 months. (Id.) Pursuant to U.S.S.G. § 2K2.4(b), Probation Officer Riggs stated that the Guidelines sentence for Count V is the statutory minimum, five years' imprisonment. (Id. at ¶¶ 41, 73.)

Mr. Hicks filed several objections to the PSI on Clark's behalf.  (Id. at pp. 25–32.)  The targets of Mr. Hicks' objections included: the use of the term "Clark DTO"; references to shooting incidents involving the organization; the quantity of drugs attributed to Clark; the adjustment for obstruction of justice; the lack of a downward adjustment for acceptance of responsibility; the inclusion of other criminal conduct; and the total offense level calculations. (Id.)  Based on these objections, Mr. Hicks contended that Clark's Guidelines range of imprisonment for Count One should be 57 to 71 months.  (Id. at p. 31.)

Mr. Hicks argued that Clark should only be held accountable for 28.05 grams of cocaine, which would result in a base offense level of 24.  (Id. at pp. 26–27)  Probation Officer Riggs responded at length and explained, among other things, that this objection was thwarted by Clark's own statements.  (Id. at pp. 27–28.)  Clark admitted in his post-arrest interview that he sold $600 of crack cocaine per week for ten months.  (Id. at p. 27.)  The "investigation revealed that, during the period of the conspiracy, 1 gram of crack cocaine sold for approximately $100. As such, at a minimum, Clark would be accountable for at least 240 grams of crack cocaine (6 grams per week for at least 40 weeks), based solely on his admissions regarding his personal drug sales."  (Id.)  Moreover, the Probation Officer explained that, under U.S.S.G. § 1B1.3, Clark's relevant conduct included not only the quantities of controlled substances he personally delivered but also those distributed by other members of the conspiracy "within the scope of the jointly undertaken criminal activity."  (Id.)  Ultimately, Probation Officer Riggs stated that the amount of drugs he attributed to Clark "is extremely conservative given that it is based on the period of the wiretap investigation (approximately 10 weeks), rather than the period of the entire charged conspiracy (approximately 15 months)."  (Id. at p. 28.)

Mr. Hicks also objected to the PSI's conclusion that Clark was a leader or organizer of the criminal activity and the resulting four-level enhancement. (Id. at pp. 28–29.) The Probation Officer first explained that Clark need only have led the action of at least one of the participants of the conspiracy for the U.S.S.G. § 3B1.1 enhancement to apply. (Id. at p. 28.) Probation Officer Riggs then detailed that Clark had instructed other individuals to conduct drug transactions on multiple occasions. (Id. at p. 29.)

Mr. Hicks also contested the recommended adjustment for obstruction of justice and denial of Clark's acceptance of responsibility. (Id. at pp. 29–30.) He argued that because Clark had admitted to participating in the conspiracy and to possessing the Taurus 9mm pistol, he had been truthful with the Court and the Probation Officer. (Id.) Mr. Hicks argued that Clark truly had no knowledge of the firearms found beneath the house and that another individual, Johnny Lee Williams, found and relocated "the Terminator." (Id. at p. 29.) The Probation Officer responded that, according to Agent Hall, the investigation revealed that Jalacia Green delivered the "the Terminator" to Clark and that Clark hid that firearm and others beneath his house. (Id. at pp. 29–30.) Thus, Probation Officer Riggs opined that a preponderance of the evidence indicates that Clark provided false testimony at his Rule 11 hearing and denied conduct comprising an offense of conviction. (Id.)

Mr. Hicks filed a Sentencing Memorandum on January 20, 2016, in which he reiterated his objections to the PSI and argued for a sentence well below that recommended by the Probation Officer. (Doc. 651.) Mr. Hicks argued that a total sentence of 120 months would be sufficient to satisfy the purposes of sentencing set forth in 18 U.S.C. § 3553. (Id.)

### III.    Clark's Sentencing Hearing[4]

Clark appeared before Judge Wood for a sentencing hearing on January 21, 2016.  (Docs. 658, 703.)  At the beginning of that hearing, Judge Wood addressed Clark and Mr. Hicks and outlined the remaining objections to the PSI.  (Doc. 703, pp. 4–8.)  The Government then called witnesses to testify, beginning with Probation Officer Riggs.  (Id. at p. 10.)  Officer Riggs explained that in preparing Clark's PSI, he reviewed a large amount of discovery materials, including recordings of wiretapped conversations from Clark's phone, interviews of co-defendants, FBI reports, and grand jury transcripts.  (Id. at pp. 10–12.)  The wiretap conversations revealed that Clark was a leader in the conspiracy because he gave directions to co-defendants regarding drug trafficking activities.  (Id. at pp. 12–13.)  Clark also discussed weapons and the hiding of weapons during the recorded phone calls.  (Id. at p. 13.)  Officer Riggs then explained how he calculated the quantity of drugs attributable to Clark and information pertaining to Clark's possession of firearms.  (Id. at pp. 14–19.)  Mr. Hicks cross-examined Officer Riggs regarding his conclusion that Clark knew about the firearm found beneath the house.  (Id. at pp. 19–25.)

The Government next called Jalacia Green to testify.  (Id. at p. 25.)  Green stated that she was romantically involved with Christopher Young, and that she and  Young have a daughter together.  (Id. at p. 26.)  She admitted that Young sold drugs and that she helped him sell drugs. (Id. at p. 27.)  Green explained that Young and Clark were close and that the two of them sold drugs together on Wolfe Street every day.  (Id. at p. 28.)  She further testified about how the firearm known as "the Terminator" came to be in Clark's possession.  (Id. at pp. 28–33.)  Green

---

[4]  After Clark's change of plea hearing and Mr. Hicks' submission of objections to the PSI, but before the sentencing hearing, Clark filed a letter motion requesting that the Court appoint new counsel.  (Doc. 628.) The Court held a sealed hearing on this Motion on January 7, 2016.  (Doc. 638.)  The Court found no cause to replace Mr. Hicks and, therefore, denied Clark's Motion.  (Doc. 639.)

identified the gun in a photograph exhibit introduced by the Government and explained that, after Young's arrest, Young told her to give the gun to Clark.  (<u>Id.</u> at pp. 28–30.)  Green then drove the gun to Clark's house and left after Clark took "the Terminator" out of the trunk of her car. (<u>Id.</u> at pp. 32–34.)

Next, the Government called Agent Hall to testify. (<u>Id.</u> at p. 37.)  Agent Hall provided background information on the activities that led to the investigation of Clark and his co-defendants, including several acts of violence.  (<u>Id.</u>at pp. 49–50.)  Agent Hall outlined the investigation into the drug trafficking conspiracy and explained how the organization came to be known as the Clark DTO.  (<u>Id.</u>)  He testified that Clark and Young were the leaders of the conspiracy. (<u>Id.</u>at pp. 38–39.)  During just the two months of the wiretap, Agent Hall calculated the amount of drugs involved in Clark's case to be approximately 19 ounces. (<u>Id.</u> at pp. 72–73.)  Agent Hall attested that Clark admitted to dealing crack cocaine for ten months, and one of Clark's customers testified that he had been purchasing crack cocaine from Clark for approximately two and a half years.

Agent Hall also described searching Clark's house on December 5, 2014.  (<u>Id.</u> at pp. 39–46.)  The Government introduced photographs taken during the search.  (Docs. 653-10, 653-11.)  Agent Hall identified several items depicted in the photos, including a stack of money on a living room table, the 9mm handgun found beside Clark, boxes of baking soda which Agent Hall testified is used for cooking crack cocaine, gang literature, and guns and ammunition that were found beneath Clark's residence.  (Doc. 703, pp. 39–46.)  The firearms included the previously-discussed "Terminator" as well as a firearm that "has the appearance of an Uzi."  (<u>Id.</u> at p. 45.)  Agent Hall also stated that agents found powder cocaine, crack cocaine, and a kilo press in Clark's residence.  (<u>Id.</u> at pp. 46, 72.)  Agent Hall testified that, after the search, Clark admitted

to selling crack cocaine on Wolfe Street "24/7" and to possessing the 9mm firearm. (Id. at p. 47.)

Agent Hall described the firearms found beneath Clark's house as "assault style weapons." (Id. at p. 72.) Additionally, Agent Hall testified that Clark's organization was "particularly violent," "some people were robbed and beaten up" as part of the conspiracy, and efforts were made to intimidate witnesses in Clark's case. (Id. at pp. 71–74.) Agent Hall further testified that: the Clark DTO was involved in kidnapping, armed robbery, assault, and aggravated assault; other drug dealers were fearful of Clark; and Agent Hall had advised other drug dealers that Clark had made credible threats of violence against them. (Id. at pp. 92–93.)

During Agent Hall's testimony, the Government introduced a disk containing the recorded calls and texts from Clark's phone and several call transcripts. (Docs. 653-1–653-9.) The Government played the audio of some of those calls for the Court. (Doc. 703 at pp. 51–61.) During these calls, Clark directed other members of the conspiracy to take certain actions in furtherance of the conspiracy. (Id.) On December 2, 2014, Clark directed Ebone Alvin to, "Get them guns, wrap it up and tell Calvin to put it under the house, hurry up man." (Doc. 653-6.) Additionally, the Government introduced transcripts of calls that corroborated Ms. Green's statement that she left Young's firearm with Clark. (Docs. 653-7, 653-8; Doc. 703, pp. 63–67.) One transcript documented a conversation between Young and Clark where Young asked whether Clark "put the Uzi up," and Clark responded that he had put the Uzi up because it was raining the night before. (Doc. 653-9; Doc. 703, pp. 67–68.)

Following Agent Hall's testimony, Mr. Hicks offered extensive argument in support of Clark's objections and elaborated on why a sentence of 60 months as to Count One and 60 months as to Count Five was appropriate. (Id. at pp. 94–101.) Judge Wood stated, "Mr. Hicks, I

think you did as thorough a job as could be done." (Id. at p. 102.) However, she found that the facts supported the Probation Officer's conclusions and cut against Clark's objections. (Id.) Judge Wood then specifically addressed each of Clark's objections and explained how the facts revealed at the sentencing hearing called for her to overrule those objections. (Id. at pp. 102–106.) Judge Wood adopted the Probation Officer's findings of fact, concurred with his conclusions, and found a total offense level of 38 and a criminal history category of IV. (Id. at pp. 106–107.) The Court found the advisory Guidelines range to be the statutory maximum of 240 months imprisonment as to Count One and a consecutive term of 60 months' imprisonment as to Count Five. (Id.) The Government then argued for the Court to sentence Clark to 240 months as to Count One and 84 months as to Count Five. (Id. at p. 109.) After hearing from Mr. Hicks and Clark, Judge Wood sentenced Clark to 300 months' imprisonment. (Id. at p. 113.) That term is comprised of 240 months as to Count One and a consecutive term of 60 months as to Count Five. (Id.)

## IV.    Clark's Appeal

Following his sentencing, Clark filed a *pro se* Notice of Appeal to the United States Court of Appeals for the Eleventh Circuit based on a claim of ineffective assistance of counsel. (Doc. 668.) In that same notice, Clark requested the appointment of new counsel to represent him on appeal. (Doc. 669.) This Court granted Clark's Motion but stated that it "is not making any commentary on prior counsel's performance as the Court is unaware of any deficiency in counsel's performance in this case." (Doc. 684.) The Court appointed Mr. Richard Allen, and Mr. Allen represented Clark before the Eleventh Circuit. Clark then filed another Motion for Appointment of New Counsel on April 25, 2016. (Doc. 742.) This Court denied that Motion after a hearing. (Doc. 769.) On December 22, 2016, the Eleventh Circuit declined to consider

Clark's ineffective assistance of counsel claims on direct appeal and affirmed Clark's conviction. (Doc. 823, p. 3.)

## V.     Clark's Section 2255 Motion

Clark filed his Section 2255 Motion on October 27, 2016, during the pendency of his direct appeal. (Doc. 804.) The Court stayed Clark's Motion until the Eleventh Circuit resolved his appeal. (Doc. 816.) Following the Eleventh Circuit's affirmance, the Government filed a Response, (doc. 842), and Clark filed a Reply, (doc. 846).

In his Section 2255 Motion, Clark raised the following claims:

- the Court lacked jurisdiction to convict him because 21 U.S.C. §§ 841 and 846 are unconstitutional, (doc. 840-1, pp. 9–28);

- 21 U.S.C. § 846 will not support a conviction under 18 U.S.C. § 924(c), (id. at pp. 9, 29–33);

- Mr. Hicks was ineffective for failing to investigate and prepare a defense, (id. at pp. 9, 36);

- Mr. Hicks was ineffective for not allowing Clark to review evidence, (id. at pp. 9, 34–35);

- Clark's guilty plea was involuntary due to Mr. Hicks' errors, (id. at pp. 9, 39–40);

- Mr. Hicks was ineffective for failing to object to the misapplication of the Sentencing Guidelines, (id. at pp. 9–10, 37–38); and

- Mr. Hicks was ineffective for failing to file a Notice of Appeal, (id. at pp. 9–10, 38–39).

Clark filed an affidavit stating that, during the pretrial stage of his case, Clark sought to view the evidence the Government claimed to have against him, but Mr. Hicks denied his request. (Doc. 805.) Clark also averred that Mr. Hicks refused to object to Clark's enhancement for a leadership role. (Id.) Additionally, Clark stated that Mr. Hicks informed Clark he would get a three level reduction for pleading guilty, but Clark was denied the reduction and given an

enhancement for obstruction of justice instead. (Id.) Lastly, Clark claimed he instructed Mr. Hicks to file an appeal after his sentencing, but Mr. Hicks did not do so.

In its Response to Clark's Section 2255 Motion, the Government opposed each of Clark's claims. (Doc. 842.) The Government argued that the collateral attack waiver in Clark's plea agreement barred both his argument that the Court lacked jurisdiction over his drug offenses and that an offense under 21 U.S.C. § 846 cannot serve as a predicate drug trafficking crime for a conviction under 18 U.S.C. § 924(c). (Id. at pp. 9–11.) The Government also argued that Clark procedurally defaulted these arguments by failing to raise them on appeal and that the arguments are meritless. (Id.) The Government further averred that Clark's guilty plea waived Clark's two pre-plea ineffective assistance of counsel claims—that Mr. Hicks failed to prepare and investigate a defense and failed to allow Clark to review the evidence. (Id. at pp. 12–15.) As for Clark's argument that Mr. Hicks failed to object to the Guidelines calculation, the Government pointed out that Mr. Hicks did, in fact, object to the calculation. (Id. at p. 15–16.) Furthermore, the Government contended that Clark cannot show prejudice for Mr. Hicks' failure to file an appeal because Clark filed a *pro se* Notice of Appeal and was represented by counsel on appeal. (Id. at p. 17.) Lastly, the Government argued that Clark's plea was knowing and voluntary. (Id. at pp. 18–21.)

In his Reply, Clark conceded many of the arguments raised by the Government and abandoned some of his claims. He conceded, "for the sake of argument," his first claim that the Court lacked jurisdiction because Sections 841 and 846 are unconstitutional as well as his claim that a violation of Section 846 will not support a Section 924(c) conviction. (Doc. 846, p. 6.) Clark also conceded that his claim regarding Mr. Hicks' alleged failure to file a Notice of Appeal. (Id. at p. 16.) However, Clark largely stood by his claims of ineffective assistance of

counsel and that his guilty plea was unknowing and involuntary. Chiefly, Clark argued that Mr. Hicks misled him by telling Clark he could be convicted of possessing firearms in furtherance of his drug trafficking conspiracy "as long as there are guns and drugs in the same location or same proximity." (Id. at pp. 8–9; 16–17.) After citing portions of a number of Eleventh Circuit decisions, Clark argued that the Government would have to prove that he used or carried the firearm in order to convict him of violating Section 924(c). (Id. at pp. 9–11.) Clark also reiterated his claim that Mr. Hicks refused to allow Clark to access or review the evidence against him. (Id. at p. 13.) Finally, Clark continued to claim that Mr. Hicks failed to adequately object to the Probation Officer's Guidelines calculation. (Id. at p. 15.)

## DISCUSSION

A movant is not entitled to habeas relief "when his claims are merely conclusory allegations unsupported by specifics or contentions that in the face of the record are wholly incredible." Tejada v. Dugger, 941 F.2d 1551, 1559 (11th Cir. 1991). "The allegations must be factual and specific, not conclusory. Conclusory allegations are simply not enough to warrant a hearing." Chavez v. Sec'y Fla. Dep't of Corr., 647 F.3d 1057, 1061 (11th Cir. 2011) (citing San Martin v. McNeil, 633 F.3d 1257, 1271 (11th Cir. 2011)). For a movant proceeding *pro se*, the court will liberally construe the pleading, but he or she "must suggest (even if inartfully) that there is at least some factual support for a claim; it is not enough just to invoke a legal theory devoid of any factual basis." Jones v. Fla. Parole Comm'n, 787 F.3d 1105, 1107 (11th Cir. 2015). "An evidentiary hearing may be necessary where the material facts are in dispute, but a [movant] is not entitled to an evidentiary hearing when his claims are merely conclusory allegations unsupported by specifics." Pugh v. Smith, 465 F.3d 1295, 1300 (11th Cir. 2006) (citations omitted). Stated another way, "if a habeas petition does not allege enough specific

facts, that if they were true, would warrant relief, the petitioner is not entitled to an evidentiary hearing." Chavez, 647 F.3d at 1060 (citing Allen v. Sec'y Fla. Dep't of Corr., 611 F.3d 740, 763 (11th Cir. 2010)).

Further, because solemn representations at a plea hearing by a defendant, his attorney, and the prosecutor "carry a strong presumption of verity" and "constitute a formidable barrier in subsequent collateral proceedings," a movant's later "presentation of conclusory allegations unsupported by specifics is subject to summary dismissal . . . ." Blackledge v. Allison, 431 U.S. 63, 73–74 (1977) (citing Machibroda v. United States, 368 U.S. 487, 495–96 (1962), and Price v. Johnston, 334 U.S. 266, 286–87 (1948)). "[I]f the Rule 11 plea-taking procedure is careful and detailed, the defendant will not later be heard to contend that he swore falsely." United States v. Stitzer, 785 F.2d 1506, 1514 n.4 (11th Cir. 1986). The statements of a defendant in open court are presumed to be true. See United States v. Gonzalez-Mercado, 808 F.2d 796, 800 n.8 (11th Cir. 1987). Thus, "[o]nly in the most extraordinary circumstances" will an evidentiary hearing be required to dispose of the later contention that statements made during the change of plea were untruthful." Blackledge, 431 U.S. at 80 n.19.

Clark's claims largely rely upon conclusory allegations that are refuted by the undisputed record evidence in this case. Moreover, throughout his Section 2255 pleadings, Clark contradicts his own sworn statements from his change of plea hearing. Thus, the Court could easily dispose of his claims without a lengthy analysis or evidentiary hearing. Nonetheless, in the interest of completeness, the Court addresses each of Clark's claims.

## I. Clark's Abandoned Claims

In his original Motion, Clark argued that the Court lacked jurisdiction to convict him because 21 U.S.C. §§ 841 and 846 are unconstitutional, (doc. 840-1, pp. 9–28), and that 21

U.S.C. § 846 will not support a conviction under 18 U.S.C. § 924(c), (id. at pp. 9, 29–33). Clark has now abandoned those arguments. (Doc. 846, p. 6.) Thus, the Court need not address those claims. See Ling v. Jones, No. 4:13CV84-MW/CAS, 2015 WL 7769278, at *3 (N.D. Fla. Nov. 5, 2015), *report and recommendation adopted*, No. 4:13CV84-MW/CAS, 2015 WL 7776919 (N.D. Fla. Dec. 2, 2015).

But even if Clark had not abandoned these claims, the Court should deny them. As explained by the Government in its Response, these claims are barred by Clark's collateral attack waiver, and Clark procedurally defaulted the claims by failing to raise them on direct appeal. (Doc. 842, pp. 9–12.) Furthermore, the claims lack merit. The Eleventh Circuit Court of Appeals and the United States Supreme Court have rejected constitutional challenges to 21 U.S.C. §§ 841 and 846. See, e.g., Gonzalez v. Raich, 545 U.S. 1, 9 (2005); United States v. Wilson, 238 F. App'x 571, 572-73 (11th Cir. 2007). Clark's argument that participating in a conspiracy to distribute controlled substances does not constitute a drug trafficking offense is nonsensical.

For these reasons, the Court should **DISMISS** Clark's claims regarding the constitutionality of 21 U.S.C. §§ 841 and 846 as well as his claim that his violation of 21 U.S.C. § 846 will not support a conviction under 18 U.S.C. § 924(c).

## II.     Clark's Knowing, Voluntary, and Intelligent Guilty Plea

Throughout his pleadings, Clark claims that his guilty plea was involuntary, because Mr. Hicks did not allow him to review the evidence against him and misadvised him as to what was required to convict him of possessing a firearm in furtherance of a drug trafficking crime. The Government disagrees and argues that Clark's knowing and voluntary guilty plea waives his pre-plea ineffective assistance claims. (Doc. 842, pp. 12–13.)

After pleading guilty, a defendant can only attack his resulting conviction in "strictly limited" circumstances. <u>Bousley v. United States</u>, 523 U.S. 614, 621 (1998). A Section 2255 challenge to a conviction by guilty plea is "ordinarily confined to whether the underlying plea was both counseled and voluntary. If the answer is in the affirmative, then the conviction and the plea, as a general rule, foreclose the collateral attack." <u>United States v. Broce</u>, 488 U.S. 563, 569 (1989) (finding constitutional that defendant could not raise double jeopardy claim on collateral attack following guilty plea). Pertinently, a "knowing and voluntary guilty plea waives all non-jurisdictional, pre-plea defects, including ineffective assistance of counsel with respect to issues not implicating the voluntariness of the plea." <u>Wilson v. United States</u>, 962 F.2d 996, 997 (11th Cir. 1992) (per curiam).

Given the "careful and detailed" procedure that Judge Wood employed at the Rule 11 hearing and Clark's sworn statements during that hearing, Clark cannot credibly argue that his guilty plea was involuntary, unknowing, or unintelligent. <u>Stitzer</u>, 785 F.2d at 1514 n.4. As laid out above, during the plea hearing, Judge Wood went to great lengths to make certain that Clark's guilty plea was a product of his own free choice and made with full knowledge of the consequences of that plea. (Doc. 572.) Clark stated that no one was pushing him, leaning on him, or making him plead guilty, and that he wanted to plead guilty. (<u>Id.</u> at p. 3.) Among other things, Judge Wood apprised Clark of the rights he would waive if he pleaded guilty, the elements of the crimes with which he was charged, the potential penalties he faced, and the federal sentencing scheme. Throughout the plea hearing, Clark was able to converse with the Court, recount personal information, and respond to all of the Court's questions. (<u>Id.</u> at pp. 1–26.) Having carefully observed and questioned Clark at length, Judge Wood found that Clark was "participating in this hearing knowingly and intelligently" and that he appreciated the

charges pending against him as well as "the essential elements that make up each charge." (Id. at pp. 21–22.) She found that Clark understood the rights that he was waiving and "the consequences of his plea." (Id.) Based on these findings, Judge Wood concluded that Clark knowingly and intelligently participated in the hearing and that his offer to plead guilty was voluntary. (Id. at p. 23.) Clark testified under oath that he agreed with that assessment. (Id.)

At no point during his plea hearing did Clark indicate in any way that he did not understand the proceedings or the decision he was making. At no point did Clark indicate that he did not understand the wrongfulness of his actions or that his attorney had failed to fully investigate any issue. To the contrary, Clark stated that he wanted to plead guilty to Counts One and Five because he was "in fact, guilty" of those two Counts. (Id. at p. 21.) Importantly, despite being given every opportunity to do so, Clark never expressed any confusion whatsoever about the elements of the charges against him or penalties that he faced. Given this extensive colloquy and Clark's sworn declarations, Clark cannot now be heard to argue that his plea was unknowing and involuntary. Blackledge, 431 U.S. at 73–74.

Clark also specifically testified that he and Mr. Hicks had reviewed and discussed the Indictment together as well as the plea agreement and the Sentencing Guidelines. (Id. at p. 11.) Clark affirmed that he was satisfied with Mr. Hicks' representation and that he did not have any complaints about that representation whatsoever. (Id. at pp. 11–12.) Thus, Clark's sworn testimony before this Court thwarts Clark's self-serving conclusory allegations regarding Mr. Hicks' performance leading up to the plea hearing.

Further, at the Rule 11 hearing, Clark testified that he read over the plea agreement, discussed it with Mr. Hicks before signing it, and that he was not relying upon any promises outside of the plea agreement. (Doc. 572, p. 19.) In the plea agreement itself, Clark agreed,

among other things, to the factual basis of the charges against him and to his guilt of Counts One and Five. (Doc. 565, pp. 4–5.) He agreed that he would not be able to back out of his guilty plea if he received a sentence more severe than he expected. (Id. at p. 6.) Pertinently, Clark relayed to the Court his complete satisfaction with Mr. Hicks' representation and confirmed that Mr. Hicks had rendered faithful, skillful, and diligent assistance. (Id. at p. 10.)

In seeking to shirk his solemn declarations made in his Rule 11 hearing and his plea agreement, Clark first claims that Mr. Hicks failed to review the discovery with him. However, once again, Clark's own words disprove his claim. At his plea hearing, Judge Wood repeatedly provided Clark with the opportunity to review the discovery in more detail and to further discuss the facts and law of his case with Mr. Hicks. Each time, Clark declined and elected to go forward with his guilty plea. For instance, after Clark stated, "I ain't really seen really no discovery, no phone taps," Judge Wood asked Clark if there were things that he wanted to examine before he changed his plea, but Clark declined. (Doc. 572 at p. 8.) Later, Judge Wood advised Clark of the importance of having a sufficient discussion with Mr. Hicks and asked Clark, "Do you need to talk with [Mr. Hicks] more about the facts and the law as they pertain to your case?" (Id. at p. 9.) Clark responded, "No, ma'am." (Id.) Judge Wood then followed up, "Do you feel like you've done that a sufficient amount?" (Id.) Clark responded, "Yes, ma'am." (Id.) When Clark later reiterated that he had not seen the "phone taps and other stuff," Judge Wood asked, "Is that something that you still want to look at before you plead guilty?" (Id. at p. 10.) Clark again responded that he did not. (Id.) Judge Wood continued to repeat her question and asked whether Clark wanted to look at any discovery "more closely before you enter your plea," and Clark once again responded, "No, ma'am." (Id.) At the conclusion of the Rule 11 hearing, Judge Wood noted that she had explored Clark's statements regarding his

review of discovery and ultimately found that Clark was satisfied with the discussions he had with Mr. Hicks. (Id. at p. 22.) Judge Wood stated, "Mr. Clark in particular says that he does not want to take any more time looking at any other discovery before he enters his plea. I find no reason to doubt the truth of that statement." (Id.)

The Court must rely upon the truthfulness of Clark's prior sworn statements when ruling on his Section 2255 Motion. The Court repeatedly gave Clark the opportunity to review more discovery and have additional discussions with Mr. Hicks. Clark repeatedly declined those offers and expressly stated that he wanted to plead guilty without any more review or discussions with counsel. He cannot now come into this Court and argue in direct contradiction to this testimony.

Clark also argues that he did not knowingly and intelligently plead guilty because he did not understand what the Government would have to prove in order to convict him of possessing a firearm in furtherance of a drug trafficking crime. However, as laid out above, during his Rule 11 hearing and in his Plea Agreement, Clark confirmed that he understood the elements of this crime and that he had no questions regarding those elements. (Doc. 565 pp. 4–5; Doc. 572, pp. 14–15.) Clark seeks to dodge these statements by arguing that Mr. Hicks misadvised him as to what the Government would have to prove in order to convict him under Section 924(c). (Doc. 846.)[5]

Clark has failed to plausibly allege, however, that Mr. Hicks' advice on this point was erroneous. Clark contends that the Government could not—contrary to Mr. Hicks' advice—convict him of violating Section 924(c) because there was no "specific illustration of a particular 'use' as defined by [the Eleventh Circuit] in [United States v. Parker, 411 F. App'x 220 (11th

_____

[5] Perhaps tellingly, Clark did not make this argument in his original Section 2255 Motion, and he did not include this alleged misadvice in his Affidavit filed in Support of that Motion. (Docs. 804, 805.) Rather, Clark raised this claim for the first time in his Reply Brief. (Doc. 846.)

Cir. 2010)], nor is there a specific illustration of a particular 'carry' as that term was defined by [the Eleventh Circuit] in [United States v. Harper, 477 F. App'x 550 (11th Cir. 2012)]." (Doc. 846, p. 12.) Clark's citation to these two cases is misplaced. Clark was not charged with using a firearm in furtherance of a drug trafficking crime like the defendant in Parker or carrying a firearm in furtherance of such a crime like the defendant in Harper. Rather, Clark was charged under the "possession" prong of Section 924(c) for possessing a firearm in furtherance of a drug trafficking crime.

Moreover, based on the undisputed facts of Clark's case, it was not erroneous for Mr. Hicks to convey to Clark that the Government could meet its burden to prove that Clark violated the possession prong of Section 924(c). Even excluding the other evidence against Clark, including his recorded telephone communications, the December 5, 2014 search of Clark's house alone was sufficient to convict Clark under Section 924(c). During the search, agents discovered powder cocaine and crack cocaine throughout the home, including several pieces of crack cocaine in baggies, hydrocodone pills, a kilo press in Clark's yard, a stack of cash on a living room table, and boxes of baking soda used for cooking crack cocaine. (Doc. 703, pp. 39–46; Doc. 707, ¶¶ 17–19.) Amongst all this evidence of a drug distribution operation, agents discovered Clark lying on a mattress in the living room with a loaded 9mm pistol at his side. (Id.) The Government took photographs of the items found in the home, including the 9mm. (Docs. 653-10, 653-11.) Further, following the search, Clark claimed ownership of all the drugs in the house, admitted to selling crack cocaine on Wolfe Street "24/7," and admitted to possessing the 9mm firearm. (Doc. 703, p. 47.) At the time of the search, Clark was a convicted felon prohibited from possessing a firearm. He stated that he procured the 9mm in a trade with a drug customer for $60 worth of crack cocaine, and that he obtained the firearm for personal

protection. (Doc. 707 at ¶ 21.) Clark has never recanted these admissions nor disputed these facts in his underlying criminal case, on appeal, or during this Section 2255 proceeding.

On facts similar to these undisputed facts, the Eleventh Circuit and other courts have repeatedly found that the Government met its burden of proving a defendant possessed a firearm in furtherance of a drug trafficking crime. See, e.g., United States v. Molina, 443 F.3d 824, 830 (11th Cir. 2006) (evidence sufficient to establish gun/drug trafficking nexus where firearm was in drawer of nightstand in bedroom and drugs, digital scales, and large amount of money were in bedroom closet); United States v. Garcia, 447 F.3d 1327 (11th Cir. 2006) (evidence sufficient to establish that defendant possessed firearm "in furtherance" of a drug trafficking crime where defendant's firearm was in the open drawer of the nightstand in his bedroom, the bedroom and adjoining bathroom contained drugs, and a bedroom closet contained a large amount of money); see also, e.g., United States v. Cunningham, 633 F. App'x 920, 923 (11th Cir. 2015) ("Here, the police found the handgun at issue in the same room as other firearms, ammunition, a significant quantity of cocaine, $25,000 in cash, and supplies that can be used in preparing cocaine for sale. In addition, the handgun was loaded. Given the proximity of these drug-related pieces of evidence to the handgun, a reasonable trier of fact could find that the Government established the nexus required for the 'furtherance' element."); United States v. Aguilar, 519 F. App'x 541, 547 (11th Cir. 2013) (conviction for possession of a firearm in furtherance of a drug trafficking crime upheld where firearms were found in proximity to cocaine and various other drug paraphernalia—including a kilo press, scales, plastic baggies, sifters, a breaker, and a cutting agent—because a jury could infer that firearms were to provide defense or deterrence in furtherance of the defendant's drug trafficking); United States v. Martin, 490 F. App'x 255, 259 (11th Cir. 2012) (upholding conviction for possession of a firearm in furtherance of a drug

trafficking crime where a Glock .40 firearm was found under a couch near a coffee table holding a scale with a small amount of cocaine and other drugs were recovered from the house); United States v. Harden, 351 F. App'x 393 (11th Cir. 2009) (upholding conviction for possession of a firearm in furtherance of a drug trafficking crime where pistol was found next to defendant on floor of his bedroom in proximity to cash, a pill bottle containing crack cocaine, and a digital scale); United States v. Mobley, 322 F. App'x 793, 796 (11th Cir. 2009) (a reasonable jury could have found that defendant possessed the firearm "in furtherance" of a drug-trafficking crime because: (1) drugs were being distributed from the house where he lived; (2) the firearm was easily accessible; (3) the cocaine and marijuana were illegal drugs; (4) the firearm was loaded; and (5) the firearm was in close proximity to the drugs); United States v. Jones, 314 F. App'x 261, 266–67 (11th Cir. 2009) (upholding conviction where firearm was readily accessible under a table that had a CD case with drug residue on it, there were drugs and drug paraphernalia throughout the house, and defendant was carrying a large amount of cash); United States v. Smith, 173 F. App'x 742, 747–48 (11th Cir. 2006) (conviction for possession of a firearm in furtherance of a drug trafficking offense affirmed where defendant was a convicted felon that obtained revolvers in exchange for drugs, defendant stated he used the firearms for protection, guns were not "a type typically used for a legal purpose, such as hunting," and bullets were recovered in close proximity to evidence indicating drug distribution, including baggies of cocaine, an open box of baking soda, sandwich bags, and an electronic digital scale with white residue on its surface); United States v. Hernandez, 170 F. App'x 606, 608 (11th Cir. 2005) (factual basis for guilty plea to possession of firearm where a search of the bedroom in which Defendant was located revealed a bag under the bed containing marijuana, powder cocaine, crack cocaine, and cash and a cobra handgun was located on the top shelf of the bedroom closet

within arm's length of the bed); United States v. Mackey, 265 F.3d 457, 462 (6th Cir. 2001) (conviction for possession of a firearm in furtherance of a drug trafficking offense affirmed where an illegally possessed, loaded, short-barreled shotgun in the living room was located near the scales and razor blades in a house from which the defendant sold drugs); United States v. Ceballos–Torres, 218 F.3d 409, 411 (5th Cir. 2000) (conviction for possession of a firearm in furtherance of a drug trafficking offense affirmed where a loaded 9mm gun was found on defendant's bed, which defendant claimed was for personal protection, along with 569.8 grams of cocaine and $1,360 found nearby in a bedroom closet); United States v. Henry, No. 5:07-CR-36-RS-GRJ, 2012 WL 898801, at *5–6 (N.D. Fla. Feb. 15, 2012) (possession of a firearm in furtherance of a drug trafficking offense affirmed where law enforcement discovered the firearm, a loaded 9mm pistol, on the floor, next to the bed, within several feet of cash, and found marijuana and tools of the drug trade elsewhere in the house); Willis v. United States, No. 2:09CV930-MEF, 2012 WL 1161431, at *19 (M.D. Ala. Mar. 16, 2012), *report and recommendation adopted*, No. 2:09-CV-0930-MEF, 2012 WL 1158845 (M.D. Ala. Apr. 6, 2012) ("The government presented ample evidence at trial by which the jury could find [defendant] was guilty of possessing a firearm in furtherance of a drug trafficking crime. That evidence showed that when executing a search warrant at [defendant's] residence, federal agents found two loaded handguns in her bedroom within feet of marijuana that was packaged for distribution.").

In his Reply, Clark makes conclusory and somewhat contradictory statements regarding what advice Mr. Hicks gave him on the Section 924(c) count. (See Doc. 846, pp. 9, 12.) Clark did not state in his Affidavit what Mr. Hicks told him regarding this charge. (Doc. 805.) Even construing Clark's claims liberally, he fails to establish that Mr. Hicks so misadvised him on the

charge that his guilty plea was not knowing and intelligent. For instance, Clark claims Mr. Hicks told him that "as long as there are guns or drugs in the same location or same proximity the government has made its case." (Id. at p. 9.) Indeed, in order for a defendant to be convicted of a possessing a firearm in furtherance of a drug trafficking activity, there must have been a connection between the firearm the defendant possessed and the defendant's drug trafficking offense.[6] However, the Eleventh Circuit and other courts recognize the inherent use of firearms to protect drug dealing activity. United States v. Gray, 544 F. App'x 870, 889 (11th Cir. 2013) ("We have recognized guns and drugs go together."). Thus, jurors can infer that a nexus existed between a defendant's firearms and his drug trafficking when the firearms are found in proximity to drugs and tools of the drug trade, just as they were in the search of Clark's home. See, e.g., Cunningham, 633 F. App'x at 923 ("Given the proximity of these drug-related pieces of evidence to the handgun, a reasonable trier of fact could find that the Government established the nexus required for the 'furtherance' element); United States v. Lopez-Garcia, 565 F.3d 1306, 1322 (11th Cir. 2009) ("The nexus between the gun and the drug trafficking here is plainly established by, for example, the accessibility of the firearm to [defendant], and the proximity of the gun to the drugs and the drug profits."); Molina, 443 F.3d at 830 (11th Cir. 2006) (firearm's proximity to drugs, scales, and large amount of money "established a sufficient nexus between

---

[6] The Government must prove a nexus between the firearms and the drug trafficking activity to distinguish possession in violation of Section 924(c) "from innocent possession of a wall-mounted antique or an unloaded hunting rifle locked in a cupboard." Mackey, 265 F.3d at 462; see also, United States v. Ceballos-Torres, 218 F.3d 409, 415 (5th Cir. 2000), amended on reh'g in part, 226 F.3d 651 (5th Cir. 2000) ("Nor will a drug trafficker who engages in target shooting or in hunting game likely violate the law by keeping a pistol for that purpose that is otherwise locked and inaccessible."). Clark's firearm possession in this case is easily distinguished from such innocent possession. As a convicted felon, Clark could not innocently possess a firearm. Further, Clark admitted that he obtained one of the firearms in an exchange for illegal narcotics. Clark did not keep this firearm store in a safe or gun case. Rather, he admitted he kept it for protection and had it loaded and lying beside him as he slept with an infant child in close proximity to drugs, cash, and other evidence of his drug dealing activities. Finally, the firearms found in and beneath his home are not antiques or the type used for hunting or other sporting purposes.

the firearm and the drug trafficking crime"); United States v. Johnson, 290 F. App'x 214, 227 (11th Cir. 2008) ("We have held also that the nexus requirement was satisfied where the firearm was found in the drawer of the defendant's nightstand, in close proximity 'to the drugs, digital scales, and [a] large amount of money in the bedroom closets.") (citing Molina, 443 F.3d at 830); United States v. Marin, 523 F.3d 24, 27–28 (1st Cir. 2008) (sustaining an "in furtherance of" conviction where the defendant kept a loaded handgun in his bedroom, easily accessible to him and only a few feet from the drugs he sold, and where the jury heard testimony that drug traffickers possess firearms in order to protect their drug trafficking activities); United States v. Lawrence, 308 F.3d 623, 630 (6th Cir. 2002) (when firearms were found loaded and located "in close proximity" to the drugs, "[i]t was quite reasonable for the jury to conclude that the weapons were placed strategically so that [the defendant] could defend his drugs . . . thus satisfying the 'in furtherance of' requirement of § 924(c)"); United States v. Tyler, No. 6:05-CR-75ORL18DAB, 2006 WL 334212, at *2 n.11 (M.D. Fla. Feb. 13, 2006) ("Thus, strategic placement of, as well as the proximate location to drugs, of a firearm will suffice for 'possession in furtherance of' a drug trafficking offense.").

The Government produced evidence that Clark, a convicted felon, possessed a loaded 9mm pistol for protection. This pistol was kept in the same location where Clark and his conspirators distributed narcotics and was found in close proximity to his cocaine, crack cocaine, tools of the drug trade, and cash.[7] Clark admitted to all of these facts, and he has not denied

---

[7] Though several guns were listed in the Indictment, the Government could have met its burden as to Count Five by proving that Clark possessed any of those firearms in furtherance of a drug trafficking crime. United States v. Morin, 33 F.3d 1351, 1353–54 (11th Cir. 1994) ( "[T]o obtain a conviction under 18 U.S.C. § 924(c) [for using a firearm in furtherance of a drug trafficking crime], the government needs to prove only that the defendant used one of the guns [listed in the indictment] in relation to the drug trafficking."). Thus, the Government could have convicted Clark under Section 924(c) by proving, as he admitted, that he possessed, for protection, the loaded 9mm found lying beside him in close proximity to his drugs, drug proceeds, and tools of the drug trade. In other words, the Government would not have to

these facts in his Section 2255 Motion. These facts are sufficient to convict Clark of possessing a firearm in furtherance of his drug trafficking conspiracy. Thus, it was not erroneous for Mr. Hicks to advise Clark that the Government could convict him of Count Five.

Even if Mr. Hicks had misinformed Clark as to the Section 924(c) count, that error was remedied at the Rule 11 hearing. During the plea colloquy, Judge Wood advised Clark of the elements of the offense charged in Count Five and what the Government would have to prove in order from him to be found guilty of that Count. (Doc. 572, p. 15.) Judge Wood explained that the Government would have to prove that Clark possessed a firearm *and* that the possession was in furtherance of the drug trafficking conspiracy charged in Count One. (Id.)[8] Clark responded that he understood those elements, and he had no questions regarding what the Government

---

prove that Clark possessed the firearms found beneath his home in furtherance of a drug trafficking crime in order to convict him under Section 924(c).

Nonetheless, even as to those firearms, the Government could prove that Clark possessed the guns in furtherance of a drug trafficking crime based on the undisputed evidence. Agents found a loaded revolver, a loaded pistol, a loaded and unloaded rifle, and two 30-round ammunition magazines hidden beneath Clark's home from which he admitted he regularly distributed narcotics. See United States v. Vasquez-Padilla, 330 F. App'x 883 (11th Cir. 2009) (finding evidence of a nexus between firearms and defendant's drug-trafficking operation where officers uncovered firearms, most of which were fully loaded, from attic of a home that contained ammunition magazines, drugs, drug paraphernalia, and evidence of drug distribution). Clark claimed that he did not put these firearms beneath the home, and that co-defendant Johnny Lee Williams placed at least one of the firearms, the aforementioned "Terminator," beneath the home. (Doc. 707, p. 29.) As laid out above, the Government produced evidence contradicting Clark's denial, including the testimony of Jalacia Green and recorded phone conversations in which Clark discussed the firearms. Moreover, even if a jury believed Clark's account, possession of a firearm can be joint or sole, and Clark could have been held liable for his co-conspirator's firearm possession if the possession was reasonably foreseeable. United States v. Gray, 544 F. App'x 870, 889 (11th Cir. 2013) (citing United States v. Diaz, 248 F.3d 1065, 1099–100 (11th Cir. 2001)). Additionally, possession of a firearm "may be either actual or constructive." United States v. Sweeting, 933 F.2d 962, 965 (11th Cir. 1991). The government can establish constructive possession of a firearm by proving that the defendant exercised ownership, dominion, or control over the firearm or the property concealing the firearm. United States v. Garcia-Jaimes, 484 F.3d 1311, 1323 (11th Cir. 2007) *judgment vacated on other grounds by* Moreno-Gonzalez v. United States, 553 U.S. 1091 (2008); United States v. Gunn, 369 F.3d 1229, 1234 (11th Cir. 2004); United States v. Ferg, 504 F.2d 914, 916 (5th Cir. 1974). Thus, the jury could have found that Clark constructively possessed the firearms beneath his home even if Clark did not actually possess them. Thus, Mr. Hicks' ultimately did not misadvise Clark when he said that the Government could carry its burden as to Count Five.

[8] Clark's plea agreement explained the same. (Doc. 565, pp. 4–5.)

would have to prove.  (Id.)  Thus, before Clark pleaded guilty, the Court had apprised Clark of the "in furtherance" connection that must exist between the firearm and his drug trafficking activity and he acknowledged that connection.  Clark cannot now say that he entered his guilty plea unknowingly or unintelligently because he was unaware of the "in furtherance" element of his Section 924(c) conviction.  Edwards v. United States, No. 8:09-CR-374-T-27EAJ, 2012 WL 1665432, at *2 (M.D. Fla. May 11, 2012) ("Petitioner's Rule 11 plea colloquy, and the terms of his plea agreement, belie his contention that '[n]o one explained the elements of the crime to me' and that he did not understand what he was pleading guilty to.  Even if counsel failed to explain the elements of a § 924(c) offense, the record conclusively establishes that the Magistrate Judge explained those elements to Petitioner [at the change of plea hearing], and that Petitioner acknowledged under oath his understanding of the elements."); United States v. Church, No. CIV.A. 2:05CV403-WHA, 2007 WL 2274399, at *4 (M.D. Ala. Aug. 6, 2007) (Thus, even if [defendant's] counsel failed to properly explain the elements of § 924(c) to him, no prejudice inured to [defendant] because the government's counsel fully explained those elements, and [defendant] indicated that he understood the elements and acknowledged in open court that he was guilty of the offense.").

For all of the above stated reasons the Court should **DENY** Clark's claims that he did not knowingly and intelligently plead guilty.  The record in this case, including Clark's extensive plea colloquy, thwarts these claims.  His attempts to assail his own sworn statements by arguing that his counsel failed to properly advise him fall short.

## III.    Clark's Claims of Ineffective Assistance of Counsel

Criminal defendants have a right to effective assistance of counsel at all critical stages of the proceedings.  Strickland v. Washington, 466 U.S. 668 (1984).  This right extends to the entry of

a guilty plea, <u>Hill v. Lockhart</u>, 474 U.S. 52, 58 (1985), and during sentencing proceedings, <u>Glover v. United States</u>, 531 U.S. 198, 202 (2001). A defendant's guilty plea, appeal waiver, or collateral attack waiver does not preclude an ineffective assistance of counsel claim premised on an involuntary and unintelligent plea. <u>United States v. Puentes-Hurtado</u>, 794 F.3d 1278, 1281, 1285 (11th Cir. 2005).

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result." <u>Strickland</u>, 466 U.S. at 686. A convicted defendant must meet two components to establish that counsel's assistance was so defective as to require reversal of a conviction or sentence: (1) his counsel's performance was deficient, i.e., the performance fell below an objective standard of reasonableness, and (2) he suffered prejudice as a result of that deficient performance. <u>Id.</u> at 685–86. "If a petitioner cannot satisfy one prong, we need not review the other prong." <u>Duhart v. United States</u>, 556 F. App'x 897, 898 (11th Cir. 2014). Thus, if a defendant cannot show prejudice, the Court need not determine whether defendant's allegations show his counsel's performance fell below an objective standard of reasonableness.

The deficient performance requirement concerns "whether counsel's advice was within the range of competence demanded of attorneys in criminal cases." <u>Hill</u>, 474 U.S. at 56. There is a strong presumption that counsel's conduct fell within the range of reasonable professional assistance. <u>Davis v. United States</u>, 404 F. App'x 336, 337 (11th Cir. 2010) (citing <u>Strickland</u>, 466 U.S. at 686). "It is petitioner's burden to 'establish that counsel preformed outside the wide range of reasonable professional assistance' by making 'errors so serious that [counsel] failed to function as the kind of counsel guaranteed by the Sixth Amendment.'" <u>LeCroy v. United States</u>,

739 F.3d 1297, 1312 (11th Cir. 2014) (quoting Butcher v. United States, 368 F.3d 1290, 1293 (11th Cir. 2004) (alteration in original)). "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Strickland, 466 U.S. at 690. Further, retrospective judicial scrutiny of counsel's performance "must be highly deferential" and must "eliminate the distorting effects of hindsight." Id. at 689. "In evaluating performance, 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" LeCroy, 739 F.3d at 1312 (quoting Strickland, 466 U.S. at 690). "[B]ecause counsel's conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take." Chandler v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000).

Even if counsel made an error so egregious as to be outside the broad scope of competence expected of attorneys, a movant can obtain relief only if the error caused actual prejudice. Strickland, 466 U.S. at 691–92. "Showing prejudice requires petitioner to establish a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." LeCroy, 739 F.3d at 1312 (internal citation omitted). "The prejudice prong requires a petitioner to demonstrate that seriously deficient performance of his attorney prejudiced the defense." Id. at 1312–13. "The likelihood of a different result must be substantial, not just conceivable." Harrington v. Richter, 562 U.S. 86, 112 (2011). A reasonable probability of a different result "is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

Here, Clark relies upon wholly conclusory allegations as support for his claims that Mr. Hicks rendered ineffective assistance. He fails to make factual and specific allegations and largely invokes legal theories without connecting those theories to the actual facts of his case. Furthermore, these allegations contradict the sworn statements Clark made during his Rule 11 hearing. Thus, the Court could dispose of his claims without in-depth analysis due to Clark's conclusory pleadings. However, the analysis below demonstrates that, even construing Clark's pleadings liberally, he is not entitled to relief.

### A. Clark's Pre-Plea Ineffective Assistance Claims

Clark's knowing, voluntary, and intelligent plea bars his claims that Mr. Hicks rendered ineffective assistance prior to the entry of his guilty plea. See Cruz v. United States, 188 F. App'x 908, 914 (11th Cir. 2006) (affirming dismissal of ineffective assistance claim where movant claimed counsel coerced her into pleading guilty based on misrepresented facts about the case and sentencing given the court's thorough explanation at plea hearing); United States v. Miley, 119 F. App'x 330, 332 (2d Cir. 2005) (holding that any prejudice from defense counsel's alleged misrepresentations was dispelled by the time movant pleaded guilty and acknowledged that no promises had, in fact, been made to him outside of the plea agreement). Given the "careful and detailed" procedure that Judge Wood employed at the plea hearing, Clark cannot now be heard to contradict his own sworn statements at that hearing. Stitzer, 785 F.2d at 1514 n.4.

Even if Clark's guilty plea did not waive these claims, he has failed to demonstrate: (1) that Mr. Hicks' pre-plea performance was deficient, i.e., the performance fell below an objective standard of reasonableness; or (2) that Clark suffered prejudice as a result of that deficient performance. Strickland, 466 U.S. at 685–86. A Section 2255 movant asserting an

ineffective assistance of counsel claim in the guilty plea process must establish that counsel's performance was deficient (i.e., professionally unreasonable) and that the deficient performance "affected the outcome of the plea process." Hill, 474 U.S. at 59. In other words, to establish prejudice, the movant "must show that there is a reasonable probability that, but for counsel's errors, he would . . . have pleaded [not] guilty and would . . . have insisted on going to trial." Id.; see also Slicker v. Wainwright, 809 F.2d 768 (11th Cir. 1987) (to be entitled to an evidentiary hearing on whether petitioner's lawyer incorrectly advised petitioner that the negotiated plea agreement provided that he would serve less time than the maximum penalty, petitioner was required to establish that he would not have pleaded nolo contendere and would have insisted on going to trial had his lawyer not misled him with faulty information).

Further, a mere allegation by a defendant that he would have insisted on going to trial but for counsel's errors, although required, is insufficient to establish prejudice. Rather, "the court must look to the totality of the objective factual circumstances surrounding the plea in order to determine whether there is a reasonable probability that the [movant] would in fact have insisted on trial." Suarez v. United States, No. 15-CR-20144, 2017 WL 3208725, at *5 (S.D. Fla. June 19, 2017), *report and recommendation adopted*, No. 16-24003-CIV, 2017 WL 3206328 (S.D. Fla. July 27, 2017) (citing Hill, 474 U.S. at 59; Hutchings v. United States, 618 F.3d 693, 697 (7th Cir. 2010)). This inquiry will often include an assessment of the strength of the prosecution's case, any available defenses the movant could have asserted at trial, the plea colloquy, and the movant's potential sentencing exposure. Id.

Clark's pre-plea claims of ineffective assistance of counsel rest on the same allegations as his claims that he did not knowingly and intelligently plead guilty. Essentially, he argues that Mr. Hicks failed to allow him to review discovery materials and misadvised him as to the

Government's ability to convict him of possessing a firearm in furtherance of a drug trafficking crime. As laid out above in Section II, these claims lack merit. Clark repeatedly stated at the Rule 11 hearing that he wanted to plead guilty without reviewing any additional materials. Thus, he cannot now blame his failure to review those materials on Mr. Hicks. Further, Clark has not demonstrated that Mr. Hicks' advice regarding the Section 924(c) count fell below an objective standard of reasonableness. Quite the contrary, for the reasons stated above, it would have been unreasonable for Mr. Hicks to advise Clark that the Government could not prove Clark guilty of Count Five. In sum, the Government would have presented the jury with significant evidence of Clark's guilt. Consequently, it was quite reasonable for Mr. Hicks to advise Clark of his dismal chances at trial. United States v. Hall, No. CIV.A. 09-00319, 2011 WL 4101504, at *3 (S.D. Ala. Sept. 13, 2011) (rejecting Section 2255 movant's conclusory claim that counsel rendered ineffective assistance by advising him that he had "no chance of winning" at trial because, among other reasons, movant failed to demonstrate that advice was erroneous); see also Doyle v. Jones, 452 Fed. App'x 836, 841–42 (10th Cir. 2011) (defendant failed to demonstrate counsel was ineffective for giving an unrealistic assessment of the case where defendant failed to demonstrate either that counsel misadvised him on the relative merits of his options, or that counsel's performance was professionally unreasonable); Dickison v. Jones, No. 3:13CV590/LC/CJK, 2016 WL 908864, at *6 (N.D. Fla. Feb. 8, 2016) (to state a legally sufficient claim for advice on chances of success at trial, movant must prove that counsel's assessment was unreasonable under the circumstances or that counsel had not investigated or otherwise was not familiar with the case), *report and recommendation adopted*, 2016 WL 901686 (N.D. Fla. Mar. 9, 2016).

Moreover, even if Hicks' pre-plea investigation and advice were deficient, Clark offers nothing more than his own self-serving allegation that he would have gone to trial but for Hicks' alleged errors. This bare assertion is not sufficient to show prejudice. Indeed, Clark's allegation is once again contradicted by his sworn testimony at the Rule 11 hearing. Upon inquiry from Judge Wood, Mr. Hicks explained that Clark wanted to plead guilty without any further examination or discussion with Mr. Hicks, in part because Clark's co-defendants had resolved their cases, and Mr. Clark was concerned that the Government was going to file a new indictment in the case. (Doc. 572, p. 8.) Clark agreed with Mr. Hicks' statement under oath. (Id. at pp. 8–9.)

Furthermore, the "totality of the objective factual circumstances" rebuts Clark's conclusory claim that he would have gone to trial. Suarez, 2017 WL 3208725, at *5. As outlined above, the Government's case against Clark was strong and included the investigation described by Agent Hall's testimony at the Rule 11 hearing, the Government's witnesses at the sentencing hearing, and the Probation Office in the PSI. (Doc. 572, pp. 23–26; Doc. 703, pp. 10–74; Doc. 707, pp. 5–12.) If Clark had proceeded to trial, he would have faced a mountain of evidence, including but not limited to:

- The search of Clark's home, which revealed Clark lying on a mattress with a loaded 9mm pistol at his side and evidence of drug trafficking, including cocaine, crack cocaine packaged for sale, cash, baking soda used to cook crack cocaine, and a kilo press in the yard;

- Clark's admissions following the search of his home, including his statement that he owned the 9mm and all of the drugs found inside the home, as well as his statement that he sold drugs "24/7" for the prior 9 to 10 months;

- Clark's girlfriend's statements that Clark sold crack cocaine and that she would sell Clark's cocaine to his customers from the home;

- Over 100 intercepted and recorded phone conversations and text messages, which showed Clark directing and conducting drug transactions and discussing the possession and movement of firearms;

- Controlled purchases of drugs from members of Clark's drug trafficking organization; and

- The testimony of cooperating witnesses, like Jalacia Green, who testified that Young and Clark sold drugs together on Wolfe Street every day and that she delivered "the Terminator" to Clark for safekeeping after Young's arrest.

Even now, in his Section 2255 Motion, Clark fails to present any credible defense to the voluminous amount of evidence that the Government would have introduced against him. Thus, there is no "reasonable probability that [Clark] would in fact have insisted on trial." Suarez, 2017 WL 3208725, at *5.

Clark now states that he would not have pleaded guilty because he received the maximum statutory penalty of 240 months' imprisonment as to Count One, the conspiracy charge against him. (Doc. 804-1 ("[H]ad counsel instructed Movant that irregardless [sic] of the plea offer at a trial he would be sentenced to the statutory maximum, there is a reasonable probabil[i]ty that Movant would have want[ed] to go to trial.") While Clark did avail himself of the opportunity to reduce his sentence by pleading guilty, Clark still received the maximum penalty on Count One because he did not accept responsibility for the firearms found beneath his home. Due to his denials, the Court did not reduce his Guidelines offense level for acceptance of responsibility and, instead, increased that offense level for obstruction of justice. (Doc. 707, p. 13.) Had Clark clearly demonstrated acceptance of responsibility for all of his relevant conduct, as the plea agreement contemplated, Clark's offense level would have been 33, resulting in a Guidelines range of 188 to 235 months. U.S.S.G. § 5A. Thus, he could have received a sentence below the statutory maximum under the plea agreement. On the other hand, if Clark had gone to trial and been found guilty, his offense level would have been at least 36, resulting in a Guidelines range

of 262 to 327 months, which would have been reduced to the statutory maximum of 240 months. Id. In sum, pleading guilty was Clark's only realistic shot to receive a sentence below the statutory maximum as to Count One. In light of this fact and the other circumstances surrounding Clark's plea, Clark has failed to show that, but for Mr. Hicks' alleged errors, he would have "rationally" insisted on going to trial. Padilla v. Kentucky, 559 U.S. 356, 372 (2010) (citation omitted). As such, Clark cannot meet the prejudice prong of his pre-plea ineffective assistance claims.

For all of these reasons, the Court should **DENY** Clark's claims that Mr. Hicks rendered ineffective assistance of counsel leading up to Clark's guilty plea.

### B. Clark's Claims regarding Mr. Hicks' Assistance at Sentencing

Clark also claims that Mr. Hicks did not assist him at sentencing and, instead, "stood by idle and failed to object to the misapplication of the guidelines." (Doc. 804-1, p. 49.) Specifically, Clark claims that Mr. Hicks should have objected to: (1) Clark receiving an increased offense level for his leadership role in the conspiracy; (2) Clark's two level enhancement for obstruction of justice; (3) Clark not receiving a reduction for acceptance of responsibility; and (4) the amount of cocaine base attributed to Clark. (Id.) Clark's claims are easily refuted by the fact that Mr. Hicks made all of the objections (and more) that Clark contends Mr. Hicks should have made.

In his objections to the PSI, Mr. Hicks: contested the Probation Officer's drug quantity calculation, (doc. 707, pp. 2–3); argued that Clark was not a leader or organizer of the conspiracy and, therefore, should not receive an enhancement for his role in the offense, (id. at p. 4); contended that Clark's denial of the firearms found beneath his home does not amount to obstruction of justice, (id. at p. 29.); and maintained that Clark had accepted responsibility for

Counts One and Five, and thus, should receive a three level reduction in his offense level, (id. at p. 6.). At the sentencing hearing, the Court recognized that these objections remained, and Mr. Hicks offered additional arguments in support of those objections. (Doc. 703, pp. 5–8, 94–101.) Judge Wood acknowledged Mr. Hicks' efforts at the conclusion of the argument and stated, "Mr. Hicks, I think you did as thorough a job as could be done . . . ." (Id. at p. 102.) However, she continued, "the facts are what they are, and as has been noted by a lot of people, they are stubborn things, and the fact is the more we looked at the evidence and the closer we looked at it, the proof became stronger and stronger against Mr. Clark and his objections and instead supported and strengthened the recommendations that the probation officer has made." (Id.) Judge Wood then addressed each of Mr. Hicks' objections directly and explained that the proof the Government provided warranted overruling each objection. (Id. at pp. 102–06.) Thus, Clark's Guidelines sentencing range resulted from the facts of Clark's case as found by Judge Wood and not due to any lapse in effort by Mr. Hicks.

For all of these reasons, Clark has failed to show that Mr. Hicks' assistance at sentencing fell below the standard of reasonableness or that any errors Mr. Hicks committed during the sentencing phase caused Clark any prejudice. For all of these reasons, the Court should **DENY** Clark's claims that Mr. Hicks rendered ineffective assistance of counsel at sentencing.

### C. Clark's Claims Regarding Mr. Hicks' Assistance on Appeal

Clark also contends that Mr. Hicks rendered ineffective assistance of counsel by failing to file an appeal on Clark's behalf. (Doc. 804-1, pp. 37–38.) The Government responded that Clark cannot show any prejudice on this claim because he filed a *pro se* Notice of Appeal and the Court appointed another attorney to represent Clark on appeal. (Doc. 842, p. 17.) In his Reply, Clark appears to concede this point and abandon this claim. (Doc. 846, pp. 15–16.)

"Counsel has a constitutionally imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal . . . or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing." Roe v. Flores-Ortega, 528 U.S. 470, 480 (2000). "Even assuming that a rational defendant would not have wanted to appeal the case, [where a defendant] expressly communicated to his attorney his desire to appeal . . .[,] Flores-Ortega mandates that the attorney conduct a specific type of consultation, informing his client about the advantages and disadvantages of appealing and making a reasonable effort to determine the client's wishes." Gomez-Diaz v. United States, 433 F.3d 788, 792 (11th Cir. 2005).

It is well-settled that an attorney's failure to file a requested notice of appeal is *per se* ineffective assistance of counsel. Flores-Ortega, 528 U.S. at 470, 483–86; Gaston, 237 F. App'x at 495. A defendant claiming ineffective assistance on that score need not demonstrate an ability to raise meritorious issues on appeal. Flores-Ortega, 528 U.S. at 477–78. Instead, he can prove ineffective assistance by showing a "reasonable probability" that he would have timely appealed had counsel not failed to file an appeal on his behalf. Id. at 484. Further, even where a defendant has signed a waiver of direct appeal as part of his plea agreement (as Clark did in this case), he has no burden to show that the issue he would have raised on appeal falls outside of that waiver. Gaston, 237 F. App'x at 497; Gomez-Diaz, 433 F.3d at 793.

In this case, on January 22, 2016, the day after Clark's sentencing hearing, Mr. Hicks met with Clark and discussed Clark's right to an appeal, the appellate process, and the advantages and disadvantages of filing an appeal. (Doc. 676.) At that time, Clark instructed Mr. Hicks to file a Notice of Appeal. (Id.) However, on January 27, 2016, only two days after Judgment was entered in his case, Clark filed a *pro se* Notice of Appeal and Motion to Appoint New Counsel.

(Docs. 668, 669.)  Shortly thereafter, and still within the time period for filing an appeal, the Court appointed a new attorney to represent Clark on appeal.  Thus, the record is clear that Mr. Hicks fulfilled his duty to consult with Clark regarding an appeal.  Further, Mr. Hicks was replaced as counsel at Clark's request before Mr. Hicks could fulfil his duty to file a Notice of Appeal.  Moreover, Clark had already filed a Notice of Appeal.  In light of these facts, it cannot be said that Mr. Hicks rendered ineffective assistance of counsel during the appellate process.

Furthermore, Clark cannot show any prejudice on this claim.  He was able to file a timely appeal and was represented by counsel on appeal.  Indeed, Clark concedes this point and abandons this claim.  Consequently, the Court should **DISMISS** Clark's claim that Mr. Hicks rendered ineffective assistance of counsel during the appellate process.

## V.  Leave to Appeal *in Forma Pauperis* and Certificate of Appealability

The Court should also deny Clark leave to appeal *in forma pauperis*.  Though Clark has, of course, not yet filed a notice of appeal, it is proper to address this issue in the Court's order of dismissal.  Fed. R. App. P. 24(a)(3) (trial court may certify that appeal of party proceeding *in forma pauperis* is not taken in good faith "before or after the notice of appeal is filed").  An appeal cannot be taken *in forma pauperis* if the trial court certifies that the appeal is not taken in good faith.  28 U.S.C. § 1915(a)(3); Fed. R. App. P. 24(a)(3).  Good faith in this context must be judged by an objective standard.  Busch v. County of Volusia, 189 F.R.D. 687, 691 (M.D. Fla. 1999).  A party does not proceed in good faith when he seeks to advance a frivolous claim or argument.  See Coppedge v. United States, 369 U.S. 438, 445 (1962).  A claim or argument is frivolous when it appears the factual allegations are clearly baseless or the legal theories are indisputably meritless.  Neitzke v. Clark, 490 U.S. 319, 327 (1989); Carroll v. Gross, 984 F.2d 392, 393 (11th Cir. 1993).  Stated another way, an *in forma pauperis* action is frivolous, and

thus, not brought in good faith, if it is "without arguable merit either in law or fact." Napier v. Preslicka, 314 F.3d 528, 531 (11th Cir. 2002); see also Brown v. United States, Nos. 407CV085, 403CR001, 2009 WL 307872, at *1–2 (S.D. Ga. Feb. 9, 2009). Based on the above analysis of Clark's pleadings and the Government's Response, there are no non-frivolous issues to raise on appeal, and an appeal would not be taken in good faith. Thus, the Court should **DENY** Clark *in forma pauperis* status on appeal.

Additionally, under 28 U.S.C. § 2253(c)(1), an appeal cannot be taken from a final order in a habeas proceeding unless a certificate of appealability is issued. Further, under Rule 11 of the Rules Governing Section 2255 Proceedings, the Court must issue or deny a certificate of appealability when entering an order adverse to the applicant. A certificate of appealability may issue only if the applicant makes a substantial showing of a denial of a constitutional right. The decision to issue a certificate of appealability requires "an overview of the claims in the habeas petition and a general assessment of their merits." Miller-El v. Cockrell, 537 U.S. 322, 336 (2003). In order to obtain a certificate of appealability, a petitioner must show "that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Id. "Where a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petitioner should be allowed to proceed further." Slack v. McDaniel, 529 U.S. 473, 484 (2000); see also Franklin v. Hightower, 215 F.3d 1196, 1199 (11th Cir. 2000). "This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims." Miller-El, 537 U.S. at 336.

Applying the Certificate of Appealability standards set forth above, Clark has not demonstrated any discernable issues worthy of a certificate of appeal. Accordingly, the Court should **DENY** the issuance of a Certificate of Appealability. If the Court adopts this recommendation and denies Clark a Certificate of Appealability, Clark is advised that he "may not appeal the denial but may seek a certificate from the court of appeals under Federal Rule of Appellate Procedure 22." Rule 11(a), Rules Governing Section 2255 Cases

## CONCLUSION

For the above-stated reasons, I **RECOMMEND** this Court **DENY** Clark's Motion to Vacate, Set Aside, or Correct his Sentence, (doc. 804), **DENY** Clark a Certificate of Appealability and *in forma pauperis* status on appeal, and **DIRECT** the Clerk of Court to **CLOSE** this case and enter the appropriate judgment of dismissal.

The Court **ORDERS** any party seeking to object to this Report and Recommendation to file specific written objections within **fourteen (14) days** of the date on which this Report and Recommendation is entered. Any objections asserting that the Magistrate Judge failed to address any contention raised in the pleading must also be included. Failure to do so will bar any later challenge or review of the factual findings or legal conclusions of the Magistrate Judge. See 28 U.S.C. § 636(b)(1)(C); Thomas v. Arn, 474 U.S. 140 (1985). A copy of the objections must be served upon all other parties to the action. The filing of objections is not a proper vehicle through which to make new allegations or present additional evidence.

Upon receipt of objections meeting the specificity requirement set out above, a United States District Judge will make a *de novo* determination of those portions of the report, proposed findings, or recommendation to which objection is made and may accept, reject, or modify in whole or in part, the findings or recommendations made by the Magistrate Judge. Objections not

meeting the specificity requirement set out above will not be considered by a District Judge. A party may not appeal a Magistrate Judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit. Appeals may be made only from a final judgment entered by or at the direction of a District Judge. The Court **DIRECTS** the Clerk of Court to serve a copy of this Report and Recommendation upon Clark and Respondent.

      **SO ORDERED** and **REPORTED and RECOMMENDED**, this 28th day of June, 2018.

R. STAN BAKER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA